FILED

APR - 4 2018

CLERK, U.S. DISTRICT CLERK
WESTERN DISTRICT OF TEXAS
BY_____
                    DEPUTY

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>*EX REL.* [UNDER SEAL],<br><br>　　　　Plaintiff,<br><br>vs.<br><br>[UNDER SEAL],<br><br>　　　　Defendants. | **FILED UNDER SEAL<br>PURSUANT TO<br>31 U.S.C. § 3730(b)(2)**<br><br>Civil Action No.<br>_____<br><br>**COMPLAINT**<br><br>Jury Trial Demanded |

FILED
APR - 4 2018
CLERK. U.S. DISTRICT CLERK
WESTERN DISTRICT OF TEXAS
BY_____ DEPUTY

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS

| | |
|---|---|
| UNITED STATES OF AMERICA, *EX REL*. Elizabeth E. Ullman, Plaintiff, vs. LAUGHLIN, MARINACCIO & OWENS, INC. and DOCUMENT PACKAGING BROKERS, INC Defendants. | FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2) Civil Action No. _____ **COMPLAINT** Jury Trial Demanded |

Plaintiff and Relator Elizabeth E. Ullman, by and through her attorneys, states that this is an action brought against Defendants LAUGHLIN, MARINACCIO & OWENS, INC. ("LM&O") and DOCUMENT PACKAGING BROKERS, INC ("DOCUPAK") (collectively: "Defendants") for violation of the Federal False Claims Act ("FCA"), 31 U.S.C. §3729, *et seq.*

## INTRODUCTION

1. This is a civil action to recover treble damages and civil penalties on behalf of the United States of America, arising from false statements and false or fraudulent claims made or caused to be made by the Defendants to the Government in violation the Federal False Claims Act, 31 U.S.C. § 3729 *et seq.* (the "FCA").

2. The Defendants' claims resulted in payments by the Department of Defense ("DoD") including, but not limited to the Army National Guard ("ARNG") to the Defendants.

3. LM&O, as the DoD contractor, and DOCUPAK, as the subcontractor, were responsible for promoting the ARNG through various fora, media and public events such as highly-attended NASCAR races and promotional events.

1

4. Leads generated through these efforts and events were to be submitted to the ARNG so that its recruitment officers could contact potential candidates. LM&O's and DOCUPAK's compensation under this contract was a flat fee and was not tied to the number of leads generated or to the number of leads that became enlistees.

5. At the same time, DOCUPAK was also under contract directly with the ARNG to assist the management of the Guard Recruitment Assistance Program ("G-RAP").

6. Under this contract, DOCUPAK was responsible for collecting information for leads generated by rank-and-file guardsmen that were then referred to a Recruitment Officer. DOCUPAK's compensation under this contract was based on the number of such leads that enlisted.

7. DOCUPAK defrauded the ARNG and, by extension the DoD and the United States, by diverting leads generated under the LM&O contract into the G-RAP program, thus leading to an improper double payment: once for purportedly satisfactory performance on the LM&O contract even where generated leads were withheld and then again under the G-RAP contract for leads that the ARNG already paid for.

8. LM&O is also liable under the FCA for falsely certifying that it complied with the quality assurance provisions of its contract as it plainly failed to ensure that its subcontractor DOCUPAK was not using its position as a subcontractor to defraud the ARNG.

## JURISDICTION AND VENUE

9. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, 31 U.S.C. § 3730, and 31 U.S.C. § 3732, which specifically confers jurisdiction on this Court for actions brought pursuant to the FCA.

10. This Court has personal jurisdiction over Defendants pursuant to 31 U.S.C. § 3732(a) because that section authorizes nationwide service of process and Defendants have sufficient minimum contacts with the United States.

11. Venue is proper in the Western District of Texas pursuant to 31 U.S.C. § 3732(a) because Defendants LM&O and DOCUPAK transacted business within this district and engaged in certain acts proscribed by 31 U.S.C. § 3729 within this district.

12. In accordance with 31 U.S.C. § 3730(b)(2), this Complaint is being filed *in camera*, shall remain under seal for a period of at least sixty (60) days, and shall not be served upon Defendant until the Court so orders.

13. In accordance with 31 U.S.C. § 3730(b)(2), Relator provided the Government with a copy of this Complaint and a written disclosure of substantially all material evidence and information in her possession either before or contemporaneously with the filing of this Complaint. More specifically, Relator complied with this provision by serving copies of this Complaint and such written disclosure upon John LoCurto, Assistant United States Attorney for the Western District of Texas and the United States Attorney General Jeff Sessions.

## THE PARTIES

### A. Defendants

14. Defendant LM&O is a Virginia corporation with principle office at 1776 Wilson Blvd, 5th floor, in Arlington, Virginia. LM&O is an advertising agency with extensive experience

executing marketing and advertising contracts for the United States Government. LM&O boasts of many lucrative contracts with the DoD and other governmental agencies. Per LM&O's website, "[f]or the past 21 years [LM&O has] helped government agencies communicate their messages in the most creative ways imaginable." (https://www.lmo.com/industries/government.). Among LM&O's many DoD contracts was a 5-year multi-award contract for advertising services from the United States National Guard for which LM&O was paid $526,181.000.

15. Defendant DOCUPAK, an Alabama corporation, with a principal address Birmingham, Alabama does not appear to have a precise street address on file with the Alabama Secretary of State. However, the company's 2017 Annual Report lists a street address for the company's president Philip Crane at 17 Clarendon Road in Mountain Brook, Alabama. (DOCUPAK'S building is at 100 Gilbert Drive in Alabaster, Alabama.) DOCUPAK was paid approximately $500 million dollars for their involvement on recruiting assistance contracts.

### B. Relator

16. Relator Elizabeth E. Ullman currently resides in Colorado.

## GENERAL ALLEGATIONS

### A. The False Claims Act

17. Under the *qui tam* provisions of the FCA, private persons may enforce the Act on behalf of the United States Government to recover amounts paid pursuant to false or fraudulent claims. See 31 U.S.C. § 3729 et seq.

18. In 1986, Congress amended the FCA to facilitate enforcement and recovery by the United States and to encourage private enforcement by *qui tam* plaintiffs (often referred to as "relators"). See, e.g., J. Boese, CIVIL FALSE CLAIMS AND QUI TAM ACTIONS 1-18 (Aspen Publishers 1999 Supp.).

19. On May 20, 2009, Congress amended the FCA pursuant to the Fraud Enforcement and Recovery Act of 2009 ("FERA") to further facilitate these goals. Under FERA, relators may recover civil penalties, plus three times the amount of damages sustained by the United States as a result of a defendant's wrongdoing. 31 U.S.C. § 3729(a)(1).

20. For purposes of the FCA, as amended by FERA, "knowing" or "knowingly" means that the defendant "(i) has actual knowledge of the falsity of the [relevant] information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information." 31 U.S.C. § 3729(b)(1)(A). No proof of specific intent to defraud is required. *Id.*

21. The word "material" is defined under the FCA, as amended by FERA, as "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." 31 U.S.C. § 3729(b)(4).

22. The FCA, as amended by FERA, further provides that liability under the act shall include "a civil penalty of not less than $5,000 and not more than $10,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 . . . [for each unlawful act], plus 3 times the amount of the damages which the Government sustains because of the act . . . ." *See* 31 U.S.C. § 3729(a)(1).

23. On March 23, 2010, Congress most recently amended the FCA by the Patient Protection and Affordable Care Act ("PPACA"). The PPACA made significant changes to the "public disclosure" provision of the FCA by eliminating what was once construed as an absolute jurisdictional bar in cases where the allegations are based on public disclosures and the relator is not an original source. See 31 U.S.C. § 3730(e)(4).

24. As amended, the FCA now reads as follows: "The court shall dismiss an action or claim under this section, unless opposed by the Government, if substantially the same allegations or transactions as alleged in the action or claim were publicly disclosed." *Id.* This section applies only to disclosures made in federal criminal, civil or administrative hearing where the government is a party, a federal government report, hearing, audit or investigation, or from the news media. *Id.*

25. The PPACA also amended the "original source" exemption under the FCA. See 31 U.S.C. § 3720(e)(4)(B). Under the previous version of the FCA, relators were only permitted to bring *qui tam* actions based upon public disclosures if the relator had "direct and independent" knowledge of the information and provided it to the Government before filing suit. However, the post-PPACA version of the FCA eliminates the "direct" knowledge requirement and requires only "[k]nowledge that is independent of and materially adds to the publicly disclosed allegations or transactions . . . ." *Id.*

## B. THE ARMY NATIONAL GUARD RECRUITING ASSISTANCE PROGRAM

26. Beginning in late 2005 and early 2006, all fifty states and four United States territories implemented the Army National Guard Recruiting Assistance Program ("G-RAP"). The program ran through 2012.

27. Essentially, the program allowed certain members of the ARNG, working in their off-duty time as subcontractors for DOCUPAK, to recruit and mentor enlistees for cash incentives. The guardsmen working as subcontractors were known as Recruiting Assistants or "RAs."

28. The cash incentives varied from $2,000-$7,500 depending on whether the recruit shipped to basic training, the position obtained by the recruit, and the current National Guard's need at the time of enlistment.

29. G-RAP was designed to be a recruitment tool to supplement the recruiting activities of full-time recruiters during a time of high demand for soldiers in a depressed recruiting market. Soldiers in the ARNG were uniquely situated to identify potential quality candidates among friends, family, and co-workers. From a budgetary standpoint, the cost of incentive payments to these soldier-recruiters was much less than the overhead cost of increasing the full-time recruiters force. In time, it was thought possible, to reassign some of the full-time recruiters to other duties, even to combat operations.

## SPECIFIC ALLEGATIONS

### A. Defendants' Improper Conduct

30. In March of 2008, LM&O received a $526 million multi-award contract for advertising services from the ARNG. As part of its advertising services, LM&O was charged with generating leads of potential recruits.

31. LM&O subcontracted with DOCUPAK to assist with the promotion of the ARNG and lead generation. LM&O was also charged with developing and maintaining "an effective quality control program…to ensure that services are performed as described" in the contract.

32. The terms of the contract specifically required LM&O to safeguard all information and data gathered during the course of executing the contract.

33. Leads generated under the LM&O contract were called "CAR Leads," short for "Contact a Recruiter." Once the CAR Leads were generated, DOCUPAK was to provide the information to an official National Guard Recruiting Officer (a Recruiter) to contact the potential recruit for follow up and potential enlistment.

34. Under the LM&O contract, neither LM&O nor DOCUPK were paid per lead generated or per actual enlistment resulting from a CAR Lead.

7

35. At the same time that DOCUPAK subcontracted for LM&O, it also held a separate contract from the ARNG to assist in the management of the G-RAP and AR-RAP programs.

36. As described above, under G-RAP and AR-RAP, rank-and-file soldiers were encouraged to identify potential recruits from among their network of friends, classmates and co-workers. G-RAP and AR-RAP termed this their "Sphere of Influence".

37. The soldiers were to provide information on potential recruits to DOCUPAK via a website clearinghouse. The information was then sent to the ARNG and USAR and a recruiter would follow up for possible enlistment.

38. As noted above, if the potential recruit enlisted, the guardsman or reservist who generated that lead would receive financial compensation as DOCUPAK's subcontractor. For every such payment, DOCUPAK received up to 16.5% of the amount of the payment. For example, DOCUPAK received, $345.00 for a $2000.00 fee paid to the RA. In other words—and in contrast to the terms of the LM&O contract—DOCUPAK's compensation under its G-RAP contract was, at least partly, a function of the number of leads that resulted in actual enlistment.

39. Thus, instead of sending the CAR Leads to the ARNG for follow-up by an Recruiter, DOCUPAK diverted those leads to the G-RAP or AR-RAP program thus receiving double payment on each recruit.

40. The CAR Leads were uploaded to the website clearinghouse by a DOCUPAK agent improperly impersonating guardsmen who frequently had no knowledge that this was occurring.

41. Indeed, when a DOCUPACK administrator for the G-RAP clearinghouse utilized the website, he had an option to "Impersonate RA [Recruiting Assistant]." It was with this function that DOCUPAK's agents uploaded CAR Leads to the G-RAP or AR-RAP computer database in

the name of guardsmen (aka "recruiting assistants") who knew nothing about the potential recruit or the origin of the potential recruit's information.

42. When the CAR lead resulted in an enlistment, DOCUPAK improperly received a payment from the Government under the G-RAP or AR-RAP contracts.

43. As a specific example of the Defendant's wrongful conduct, Relator states that DOCUPAK diverted the CAR Lead for an individual named Hector Rios and uploaded his information as if Mr. Rios had been nominated for potential enlistment by a guardsman named Angel Perales.

44. Relator is personally acquainted with Mr. Perales and knows that Mr. Perales does not know a Hector Rios and did not identify Mr. Rios as a potential enlistee under the G-RAP program.

45. Instead, DOCUPAK provided the Hector Rios lead to the ARNG via the G-RAP clearinghouse in Mr. Perales' name solely to improperly generate cash incentives for DOCUPAK.

46. In another example, DOCUPAK mis-used a short biographical message written by a guardsman named Jack Reppart to recruit potential enlistees and upload their information to the G-RAP clearinghouse in Mr. Reppart's name and without his knowledge.

47. When the leads enlisted, DOCUPAK would improperly receive a 16.5% "handling fee" from the resulting cash incentives.

48. DOCUPAK's conduct as described above is a violation of the FCA. DOCUPAK is liable for making false statements about the origin of the CAR leads it diverted to the G-RAP program for which it received payment from the ARNG.

49. DOCUPAK defrauded the ARNG and, by extension the DoD and the United States Government, by diverting leads generated under the LM&O contract into the G-RAP program.

This improper conduct caused a double payment to occur: once for purportedly satisfactory performance on the LM&O contract even where generated leads were withheld and then again under the G-RAP contract for leads that the ARNG already paid for.

50. LM&O's conduct is also a violation of the FCA. LM&O is liable for failing to properly oversee DOCUPAK's conduct as a subcontractor on the CAR contract. LM&O falsely certified to the ARNG that it developed and implemented an "effective quality control program...to ensure that services are performed as described" in the contract.

51. This false certification was a condition of payment under the LM&O contract and thus caused ARNG to improperly pay LM&O.

**The Direct Damage Sustained by the Government**

52. The Government has been directly damaged by the Defendants' course of conduct. The Defendants repeatedly and consistently submitted claims to the Government in violation of Federal law in connection with payments made by the Government on contracts awarded to the Defendants which would not have been made if the Government had known of the improper conduct by the Defendants.

53. The claims Defendants prepared and submitted under both contracts were intentionally and materially fraudulent, false, misleading, and deceptive. Defendants acted with knowledge of the falsity of the aforementioned information, in deliberate ignorance of its truth or falsity or in reckless disregard of the truth or falsity of the information, because it made affirmative representations to the Government regarding its compliance with the requirements of the Government's acquisition program.

54. These false representations were material, and were all made by Defendants with the intent and effect of misleading and deceiving the Government, which did, in fact, reasonably

rely upon such representations to its detriment. These false representations were made by the Defendants with the intent to gain an unearned economic benefit from the Government. As part of their participation in the bidding and contractual process, Defendants needed to certify that they were in compliance with all of the requirements imposed by the relevant authority.

55. Defendants acted with knowledge of the falsity of the aforementioned information, in deliberate ignorance of its truth or falsity or in reckless disregard of the truth or falsity of the information. Had the Government been aware of the aforementioned practices and the claims submitted by the Defendants would not have been paid.

## CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION
**Federal False Claims Act**
**31 U.S.C. § 3729(a)(1)(A)**

56. Relator repeats and incorporates by reference the allegations contained in the foregoing paragraphs of this Complaint as if fully set forth herein.

57. Through the acts more particularly set forth in the foregoing paragraphs, Defendants knowingly presented, or caused to be presented, to an officer or employee of the United States Government false or fraudulent claims for payment or approval in violation of 31 U.S.C. § 3729(a)(1)(A).

58. As a result of Defendants' conduct, the United States has been damaged in an amount to be proven at trial.

## SECOND CAUSE OF ACTION
### Federal False Claims Act
### 31 U.S.C. § 3729(a)(1)(B)

59. Relator repeats and incorporates by reference the allegations contained in the foregoing paragraphs of this Complaint as if fully set forth herein.

60. Through the acts more particularly set forth in the foregoing paragraphs, Defendants knowingly made, used or caused to be made or used a false record or statement material to a false or fraudulent claim payment or approval in violation of 31 U.S.C. § 3729(a)(1)(B).

61. As a result of Defendants' conduct, the United States has been damaged in an amount to be proven at trial.

## THIRD CAUSE OF ACTION
### Federal False Claims Act
### 31 U.S.C. § 3729(a)(1)(C)

62. Relator repeats and incorporates by reference the allegations contained in the foregoing paragraphs of this Complaint as if fully set forth herein.

63. Through the acts more particularly set forth in the foregoing paragraphs, Defendants conspired to commit a violation of the FCA within the meaning of 31 U.S.C. § 3729(a)(1)(C).

64. As a result of Defendants' conduct, the United States has been damaged in an amount to be proven at trial.

## FOURTH CAUSE OF ACTION
### Federal False Claims Act
### 31 U.S.C. § 3729(a)(1)(D)

65. Relator repeats and incorporates by reference the allegations contained in the foregoing paragraphs of this Complaint as if fully set forth herein.

66. Through the acts more particularly set forth in the foregoing paragraphs, Defendants had possession, custody, or control of property or money used, or to be used, by the Government and delivered or caused to be delivered, less than all of that money or property in violation of 31 U.S.C. § 3729(a)(1)(D).

67. As a result of Defendants' conduct, the United States has been damaged in an amount to be proven at trial.

## FIFTH CAUSE OF ACTION
### Federal False Claims Act
### 31 U.S.C. § 3729(a)(1)(E)

68. Relator repeats and incorporates by reference the allegations contained in the foregoing paragraphs of this Complaint as if fully set forth herein.

69. Through the acts more particularly set forth in the foregoing paragraphs, Defendants were authorized to make or deliver a document certifying receipt of property used, or to be used by the Government and, intending to defraud the Government, made or delivered the receipt without completely knowing that the receipt was true in violation of 31 U.S.C. § 3729(a)(1)(E).

70. As a result of Defendants' conduct, the United States has been damaged in an amount to be proven at trial.

## SIXTH CAUSE OF ACTION
### Federal False Claims Act
### 31 U.S.C. § 3729(a)(1)(F)

71. Relator repeats and incorporates by reference the allegations contained in the foregoing paragraphs of this Complaint as if fully set forth herein.

72. Through the acts more particularly set forth in the foregoing paragraphs, Defendants knowingly bought, or received as a pledge of an obligation or debt, public property

from an officer or employee of the Government, or a member of the Armed Forces, who lawfully may not sell or pledge property in violation of 31 U.S.C. § 3729(a)(1)(E).

73. As a result of Defendants' conduct, the United States has been damaged in an amount to be proven at trial.

### SEVENTH CAUSE OF ACTION
### Federal False Claims Act
### 31 U.S.C. § 3729(a)(1)(G)

74. Relator repeats and incorporates by reference the allegations contained in the foregoing paragraphs of this Complaint as if fully set forth herein.

75. Through the acts more particularly set forth in the foregoing paragraphs, Defendants knowingly made, used, or caused to be made or used, false records or statements material to its obligations to pay or transmit money or property to the Government, and/or knowingly concealed or knowingly and improperly avoided or decreased its obligations to pay or transmit money or property to the Government, within the meaning of 31 U.S.C. § 3729(a)(1)(G).

76. As a result of Defendants' conduct, the United States has been damaged in an amount to be proven at trial.

### PRAYER FOR RELIEF

WHEREFORE, Relator, on behalf of the United States, demand judgment against Defendants, ordering that:

a. Defendants pay an amount equal to three times the amount of damages that the United States has sustained because of Defendants' actions which Relator currently estimate to be in the millions of dollars, plus a civil penalty of not less than $5,500 and not more than $10,000, or such other penalty as the law may permit and/or require, for each violation of 31 U.S.C. § 3729 et seq.;

b. Relator be awarded the maximum amount allowed pursuant to 31 U.S.C. § 3730 and/or any other applicable provision of law;

c. Relator be awarded all costs and expenses of this action, including attorneys' fees as provided by 31 U.S.C. § 3730 and/or any other applicable provision of law;

d. Relator be awarded such other and further relief as this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Relator hereby respectfully demands a trial by jury as to all issues.

Dated: April 4, 2018.

By: _____
Douglas K. O'Connell
SBOT 00792028
O'CONNELL & ASSOCIATES, PLLC
404 West 7th Street
Austin, TX 78701
Tel: (512) 547-7265
Fax: (512) 478-1473
Doug@DougOConnell.com

Mark R. Mueller
SBOT 14623500
MUELLER LAW PLLC
404 West 7th Street
Austin, Texas, 78701
Tel: (512) 478-1236
Fax: (512) 478-1473
Mark.mueller@muellerlaw.com

William L. Hurlock
Christopher P. Furlong
MUELLER LAW, PLLC
363 Bloomfield Avenue, Suite 2-C
Montclair, New Jersey 07042
Tel: (973) 233-8290
Fax: (973) 509-9521
william.hurlock@muellerlaw.com
christopher.furlong@muellerlaw.com

ATTORNEYS FOR RELATOR